Cherokee Textile Mills v. Commissioner.
Cherokee Textile Mills v. Commissioner
Docket No. 268 P.T.
United States Tax Court
1946 Tax Ct. Memo LEXIS 244; 5 T.C.M. (CCH) 195; T.C.M. (RIA) 46064; March 13, 1946
George E. H. Goodner, Esq., for the petitioner. Irene F. Scott, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: This proceeding was brought to review the disallowance by respondent of petitioner's claim for refund of processing tax in the amount of $105,198.80, including interest in the amount of $333.67. The ultimate issue is whether petitioner bore the burden, in whole or in part, of any amount which it paid as processing tax under the Agricultural Adjustment Act, and, if so, to what extent it bore such burden. Decision by the Tax Court on a preliminary matter of the introduction of certain evidence is reported at , which contains a recital of the history of this case in the Processing Tax Board *245 of Review, the United States Circuit Court of Appeals, and the Tax Court, and which will not now be repeated. Findings of Fact Petitioner is a Tennessee corporation and from August 1, 1933, the date when the Agricultural Adjustment Act went into effect in respect of the levying of a processing tax upon the first domestic processing of cotton, and prior thereto, was engaged in the processing of cotton at its mill in Knoxville, Tennessee. Petitioner has been continuously so engaged since August 1, 1933. Petitioner has operated its cotton mill continuously since the date of its organization in 1917 as what is known to the cotton industry as a fine goods mill. With but slight exception, it produces only fine goods or colored yarn fancies out of cotton. Its operations are conducted on a contract basis, and the manufacture of its products is not begun prior to the receipt of an order from a customer containing full specifications of the cloth to be manufactured as to design, color, price, and quantity. From prior to August 1, 1931, until after August 1, 1936, McCampbell & Company of New York City acted as the exclusive selling agent for petitioner's products. It secured specifications *246 from prospective customers as to the kind and amounts of cloth desired and it then obtained an estimate from the petitioner as to the cost of manufacturing such cloth. It then negotiated in competition with other selling houses for a contract with the buyer. When such contract was secured and signed, a copy was forwarded to petitioner. Petitioner paid processing tax on the first domestic processing of cotton during the period from August 1, 1933, to April 6, 1935, inclusive. The total amount of processing tax, together with interest in the amount of $333.67, paid by petitioner during this period was $105,198.80. On or about June 30, 1937, petitioner filed with the collector of internal revenue at Nashville, Tennessee, a claim for refund of processing tax paid under Title VII of the Revenue Act of 1936 in the amount of $27,500.46. On June 20, 1939, prior to the time that respondent had taken final action on this claim, petitioner filed an amended claim for refund of processing tax paid on cotton in the amount of $104,865.13, plus interest paid in the amount of $333.67, making a total of $105,198.80. The claim so filed was disallowed and notice of such disallowance in whole was sent *247 to petitioner by registered mail on January 22, 1940. A petition for review of the disallowance of the claim for refund was filed with the Processing Tax Board of Review. Jurisdiction over such cases was transferred to the Tax Court by the Revenue Act of 1942, section 510. Subsequent to August 1, 1933, petitioner billed the processing tax as a separate item on all invoices covering sales of articles delivered pursuant to contracts which had been entered into prior to August 1, 1933. The total amount of processing tax billed as a separate item (after adjustment for amounts originally denominated processing tax and later determined to be floor stock tax) was $4,237.82. Beginning July 17, 1935, it was customary in the cotton textile business for sales contracts to carry the so-called "Worth Street Clause," which provided: If and when, for any reason, seller's liability for processing taxes levied under the Agricultural Adjustment Act, as heretofore and hereafter amended, is increased, decreased, or terminated, or such taxes shall be invalidated, by final decision of the Supreme Court of the United States, prices on any univoiced portion of this contract are subject to adjustment *248 at a rate computed on the basis of the conversion factors set up by the Treasury decision 4433, approved May 10, 1934. In addition, the seller will credit on the buyer's account the amount, computed on the basis of such conversion factors, of any such tax which, by reason of such invalidity, shall have been refunded to the seller or seller shall have been relieved from paying, with respect to any portion of this contract as to which title has passed within 120 days prior to such determination of invalidity. The title shall be deemed to have passed when goods are invoiced. No such credit shall be allowed hereunder in respect of any portion of this contract upon which a direct refund from the Government on floor stock is recoverable by the buyer or any subsequent holder. In any settlement hereunder seller shall be entitled to deduct on a pro rata basis reasonable expenses of procuring any such refund or relief. Beginning after July, 1935, and continuing until January 6, 1936, petitioner's order contracts carried the "Worth Street Clause," and pursuant thereto, reimbursements were made on such contracts to petitioner's vendees after January 6, 1936, in a total amount of $17,672.10. *249 The amount of $17,672.10 was debited to sales on petitioner's books by entry made February 29, 1936, during the period after the tax, and thereby reduced by that amount the total amount of the sales in the "before and after tax period," as shown by petitioner's books. The "Worth Street Clause" was formulated and put into practice to alleviate the uncertainty caused by cases questioning the constitutionality of the processing tax, and to encourage uninterrupted orders for cotton goods. Since the processing tax entered into the cost of textiles, it was assumed that the price of such goods would decline by the amount of the tax (4.2 cents per pound) as soon as the law was held invalid. Petitioner prepared cost data sheets on all goods manufactured by it, for the purpose of determining the cost of the goods to be used in establishing the price. Other factors in the price at which petitioner would sell were the market prices and trends. On all of its cost sheets throughout the period August 1, 1933, through January 6, 1936, the processing tax was treated as an item in the cost of cotton. The processing tax was entered on petitioner's books in a processing tax account, and at the end of *250 the accounting period it was mingled with all other costs and expenses in arriving at profit and loss. There was no difference in the method used by petitioner for including the processing tax in the cost of its goods during the period July, 1935, through January 6, 1936, and the method used by petitioner for this purpose during the period August 1, 1933, through March 31, 1935. On September 2, 1933, petitioner addressed a letter to its selling agent, McCampbell & Company, 320 Broadway, New York, New York, in which the following statements are made: * * * Therefore, unless we hear from you to the contrary, or unless we advise you otherwise at the time of quoting, all costs on men's Seersuckers or summer suitings will include the Processing Tax after adjusting it to allow for 7% commissions and 2% discount. On all handkerchiefs, shirtings or dress goods which are to be sold in the grey, our costs will include the Processing tax increased to cover 4% commissions but no terms in every instance unless stated otherwise at the time of quoting. In a contract on petitioner's account, dated July 1, 1935, after a statement of the amounts, materials, and price, appeared the following: *251 "Processing Tax Included in All." During the tax period (August 1, 1933, to April 6, 1935, inclusive) petitioner's sales were $1,951,846.87. The book value of petitioner's opening inventory on August 1, 1933, was $143,119.03; the book value of its closing inventory on April 6, 1935, was $220,975.06. The computed gross sales value or articles processed from the commodity during the tax period is $2,029,702.90. The total cost of the commodity processed was $357,933.65; the total processing tax paid, including interest, was, as above stated, $105,198.80; the total number of units of the commodity processed with respect to which the tax was paid was 2,496,789 pounds. The tax period margin per unit, computed from the foregoing, is $0.6274340. During the period before and after the tax (August 1, 1931, to July 31, 1933, inclusive, and February 1, 1936, to July 31, 1936, inclusive) petitioner's book sales were $2,339,614.50. In addition, petitioner deducted the sum of $17,672.10 from such sales on account of tax refunds. The total figure resulting is $2,357,216.60. The book values of petitioner's opening inventories for August 1, 1931, and February 1, 1936, were $203,530.37 and $156,685.52, *252 respectively, or an aggregate of $360,215.89. The book values of closing inventories on July 31, 1933, and July 31, 1936, were $143,119.03 and $154,085.40, respectively, or an aggregate of $297,204.43. The computed gross sales value of articles processed from the commodity during the base period is $2,294,275.14. The total cost of the commodity processed was $487,209.81; the total number of units processed was 4,062,666 pounds. The base period margin per unit computed from the foregoing, is $0.444797906. Such margin figures result in an excess tax period margin per unit of $0.1826371. During the tax period the petitioner purchased cotton and wool yarn which it used in the manufacture of its articles. The cost of the cotton yarn purchased during this period totaled $108,058.90, and the cost of the wool yarn totaled $60,321.48. The cost of the wool and cotton yarn in relation to the commodity processed was $0.06744 per unit. During the period before and after the tax the petitioner purchased cotton and wool yarn which it used in the manufacture of its articles. The cost of the cotton yarn purchased during this period totaled $88,538.97, and the cost of the wool yarn totaled $12,279.84. *253 The cost of the wool and cotton yarn in relation to the commodity processed was $0.02482 per unit. During the tax period the petitioner expended in respect of its business the following amounts for the items indicated: Labor
$ 725,075.42
Power
57,500.86
Supplies
77,612.36
Fuel
6,793.29
Freight
5,915.63
Water
4,916.33
Rolls
1,738.99
Loom Reeds
695.20
Dyes and Chemicals
102,250.87
Mill Expense
4,144.37
Finishing Expense
53,877.77
Commissions
83,219.58
Traveling
Discounts
1,136.57
Advertising
12,803.98
Sizing
Salaries
71,362.81
Repairs
47,719.36
Total
$1,256,763.39
During the tax period the expenditures for such items was $0.50335 per unit of the commodity processed. During the period before and after the tax petitioner expended in respect of its business the following amounts for the items indicated: Labor
$ 787,031.26
Power
93,082.76
Supplies
157,759.34
Fuel
8,377.34
Freight
7,876.68
Water
7,301.42
Rolls
6,979.82
Loom Reeds
3,025.97
Dyes and Chemicals
60,000.22
Mill Expense
2,601.77
Finishing Expense
55,116.41
Commissions
96,665.15
Traveling
2,543.02
Discounts
580.64
Advertising
Sizing
4,643.54
Salaries
98,113.60
Repairs
74,998.72
Total
$1,466,697.66
*254 During the period before and after the tax the expenditures for each item per unit of the commodity processed was $0.36102. On a per unit basis there was a tax period increase in expenses, including purchased yarn, of $0.18495. In his answer respondent asserts as an affirmative allegation that of the tax herein involved $6,149.75 has already been refunded to this petitioner's vendees, or sub-vendees, under the provisions of the Agricultural Adjustment Act. Opinion With the concession that the statutory margin computation would be unfavorable to petitioner and the elimination of its rebuttal claim based on the manufacture of a different type of cloth during the tax period, , a single issue remains. The question is whether on the whole record petitioner has borne its burden of overcoming the statutory presumption and of showing by evidence apart from it that petitioner in fact bore the burden of the cotton processing tax paid by it or of any part thereof. See . As our findings show, the margin unfavorable to petitioner, that is, the amount by which its tax period proceeds exceeded those *255 for the base period, was $0.18264 per unit. Production figures for the two periods, however, which are omitted from the margin formula, appear to show an increase in costs for the tax period of $0.18495 per unit. The difference, which may be described as reppresenting the amount of increased expense per unit for the tax period, which was absorbed by petitioner and not passed on, is $0.00231. E. Regensburg & Sons v. Helvering (C.C.A., 2nd Cir.(, . But only a part of this amount was due to petitioner's absorption of the tax, the balance being presumably attributable to the increased costs of production. In computing its selling prices petitioner naturally sought to recover all of its costs, as well as to realize a profit and the processing tax was added in, as were the other costs. It would accordingly be impossible to segregate from the computations an amount which could unequivocally be specified as a recovery on account of either one of such factors. But it is possible to make an allocation as between the two in accordance with their respective sizes. In that situation under section 907(e)(1) the burden of the tax borne by the taxpayer may be computed *256 by an apportionment between the increase in other costs and the tax. See . The tax, including interest, per unit of commodity processed, was $0.04213. The burden of the tax borne by this petitioner is accordingly to be arrived at by applying the fraction.04213 /.22708 to the figure $0.00231 and by multiplying the result by the number of units processed. The balance, that is,.18495 /.22708 of $0.00231 per unit, represents increased costs of production absorbed by petitioner, for which, of course, it is not entitled to be made whole by way of refund from the Federal Government. It is true that petitioner apparently made strenuous efforts to adjust its prices in such a way as to pass on to its vendees the full amount of the tax. This is relevant evidence as to the ultimate location of the economic burden. And it is aersuasive aspect of the present facts in concluding that part of the tax burden was passed on along with part of the other increases in costs. But it does not necessarily follow that petitioner was entirely successful in this attempt to shift the burden. We do not *257 regard that factor as conclusive by itself in respondent's favor, nor as more than one aspect of the whole record upon which is to be established under the provisions of section 907(e) the actual extent to which the burden was borne. In computing the amount of increased costs in the tax period we have resolved some incidental issues in petitioner's favor. The amount of $17,672.10 refunded by petitioner to its vendees in the period after the tax and deducted on its books from gross sales in the post-tax period has been added back in order to arrive at actual total sales for the period in question. Certain other items of commissions and advertising expense have been accepted as costs of the current period on the theory that petitioner has made the best proof to that effect available to it. See . And, as urged by petitioner, we have employed book values rather than market in dealing with inventories. But we cannot accept petitioner's method of computation of the unit figures since this does not consistently relate to the units of the commodity processed. And there is an obvious typographical error in petitioner's ultimate *258 computation which vitiates the result urged. Petitioner is concededly unable to produce exact figures with respect to some relevant items. That requires, for example, that the amount of gross sales value entering into the margin calculation be a computed figure. [1] Under the circumstances, our findings contain the most accurate and correct conclusions which it seems possible to draw from the record. A collateral question remains for consideration. It was suggested at the hearing before the Processing Tax Board of Review that refunds on account of the tax paid by this petitioner had been made to petitioner's vendees. The matter was left in abeyance at that time. If the parties cannot arrive at an agreed disposition of the facts in that respect and of their legal effect, the question may be dealt with in connection with the Rule 50 computation. Decision will be entered under Rule 50. Footnotes
1. Arrived at by adjusting gross sales for opening and closing inventories.↩